UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| SUSAN RAE BLAMER, | : Case No. 3:19-cv-00371 |
| Plaintiff, | : |
| vs. | : District Judge Michael J. Newman |
| | : Magistrate Judge Peter B. Silvain, Jr. |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : |
| Defendant. | : |

## REPORT AND RECOMMENDATIONS[1]

Plaintiff Susan Rae Blamer brings this case challenging the Social Security Administration's denial of her application for period of disability and Disability Insurance Benefits. The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), and the administrative record (Doc. #7).

**I.      Background**

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1). The term "disability" encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

In the present case, Plaintiff applied for benefits on November 21, 2015, alleging disability due to several impairments, including spinal bone spurs, a ruptured disc, sciatica, morbid obesity, depression, diabetes with insulin resistance and sleep apnea. After Plaintiff's applications were denied initially and upon reconsideration, she requested and received a hearing before Administrative Law Judge Thomas L. Wang (ALJ). Thereafter, the ALJ issued a written decision, addressing each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. She reached the following main conclusions:

| | |
|---|---|
| Step 1: | The Plaintiff last met the insured status requirement of the Social Security Act on December 31, 2017 and did not engage in substantial gainful activity during the period from her alleged onset date of June 2, 2015 through her date last insured of December 31, 2017. |
| Step 2: | She has the severe impairments of Morbid Obesity, Peripheral Neuropathy, Diabetes Mellitus II, Lumbar Degenerative Disc Disease and Spinal Stenosis, Right Hip Trochanteric Bursitis, and Depression. |
| Step 3: | She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. |
| Step 4: | Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consisted of "sedentary work … except she would need a sit/stand option with the ability to stand and stretch for 1-2 minutes every 45-60 minutes. She was limited to only occasional operation of foot controls and limited to pushing and pulling consistent with the exertional weight limits of sedentary work. Further, she could never climb ladders, ropes, or scaffolds, and never crawl or kneel. She could occasionally climb ramps and stairs, and occasionally balance, stoop, and crouch. She could occasionally reach overhead bilaterally and would need to elevate her feet 6 inches while sitting. She could have had only occasional exposure to cold temperatures below 30 degrees Fahrenheit, only occasional exposure to wetness and humidity, and only occasional exposure to pulmonary irritants, such as fumes, odors, dust, and gases. She could have had no exposure to unprotected heights or hazards, such as moving mechanical parts. She would have been limited to a low stress work setting, defined as a work setting with only occasional changes in the work setting and only goal based production, meaning work measured by end results and not pace work." |

>           Through the date last insured she was unable to perform any of her past relevant work.
>
> Step 5:   She could perform a significant number of jobs that exist in the national economy.

(Doc. #7, *PageID* #s 54-63). Based on these findings, the ALJ concluded that Plaintiff was not under a benefits-qualifying disability. *Id.* at 63.

The evidence of record is adequately summarized in the ALJ's decision (Doc. #7, *PageID* #s 54-63), Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), and Plaintiff's Reply (Doc. #12). To the extent that additional facts are relevant, they will be summarized in the discussion section below.

## II.     Standard of Review

Judicial review of an ALJ's decision is limited to whether the ALJ's finding are supported by substantial evidence and whether the ALJ applied the correct legal standards. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence is such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (citing *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007)). It is "less than a preponderance but more than a scintilla." *Id.*

The second judicial inquiry—reviewing the correctness of the ALJ's legal analysis—may result in reversal even if the ALJ's decision is supported by substantial evidence in the record. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). Under this review, "a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the

3

claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**III.    Discussion**

Plaintiff contends that the substantial evidence does not support the ALJ's: 1) failure to properly evaluate and weigh the opinion of Michael Lesniak, M.D. as Plaintiff's treating physician; 2) failure to evaluate and weigh the opinion of Certified Nurse Practitioner (CNP) Joyce Krech as an "other source" and the primary caregiver; 3) conclusion that Dr. Lesniak merely "signed off on the form" as an uninvolved supervising physician; 4) finding that the "objective evidence of record and the [Plaintiff's] relatively normal activities of daily living do not support the extreme limitations" asserted by the opinions of Dr. Lesniak and CNP Krech; and 5) rejection of CNP Krech and Dr. Lesniak's opinion regarding the Plaintiff's level of impairment because it was based mainly on the Plaintiff's subjective complaints and is not supported by the objective medical evidence. (Doc. #8).

The Commissioner responds that: 1) based on the timing and number of treating visits with Dr. Lesniak, "the ALJ correctly noted that Dr. Lesniak might have just signed off on the form, even though he had not seen the Plaintiff in over a year…[t]herefore, Dr. Lesniak was not a 'treating physician' as defined in the regulations and thus, was not entitled to the same protections as treating sources[]" (Doc. #11, *PageID* #726); 2) the ALJ properly found that CNP Krech was a nurse practitioner and therefore was not an acceptable medical source, but was instead an "other source" under the regulations; 3) substantial evidence supported the ALJ's finding that CNP Krech's opinion was entitled to little weight because it was based on Plaintiff's subjective complaints and was inconsistent with the objective medical evidence of record and her normal activities of daily living; 4) although Dr. Lesniak added his name to the form, Plaintiff did not

4

believe that she had ever discussed her limits with him and since Dr. Lesniak's opinion was primarily based on Plaintiff's subjective complaints and not supported by the objective medical evidence, the ALJ reasonably concluded that it was only entitled to little weight. (Doc. #11).

### A. Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.[2]

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement

---

[2] On January 18, 2017, the Social Security Administration promulgated "Revisions to Rules Regarding the Evaluation of Medical Evidence," which, among other things, served to eliminate the treating physician rule for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017)(to be codified at 20 C.F.R. pts. 404, 416). Since Plaintiff's applications were filed prior to the effective date of March 27, 2017, the treating physician rule is still applicable to her claims.

5

is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight.  *Id*.  Substantial evidence must support the reasons provided by the ALJ.  *Id*.

In this case, Plaintiff primarily relies on the impairment opinions of Michael D. Lesniak, M.D. and Joyce H. Krech, CNP who treated the Plaintiff at Adena Regional Medical Center from February 19, 2015 to March 26, 2018. (Doc. #7, *PageID* #s 283-318, 356-370, 463-523). The Plaintiff was seen by Dr. Lesniak for ovarian cysts, insulin resistance, and morbid obesity prior to her development of back pain. *Id*. at 309, 315, 318. However, as noted by the Plaintiff, she subsequently treated with Dr. Lesniak for her resulting back pain and radiculopathy later in June of 2015.  *Id*. at 299-301. Dr. Lesniak's initial examination found the Plaintiff to be extremely obese, demonstrate an abnormal gait with limited range of motion and pain with hip flexion, abduction and external rotation, marked tenderness to palpation of the right lower paraspinous muscles with spasm and pitting edema from her shins to her feet. Dr. Lesniak diagnosed sciatic leg pain, assessed Plaintiff as "super-super obese," and started her on the muscle relaxer Robaxin. *Id*. at 302-303. At a follow up examination on June 17, 2015, Dr. Lesniak diagnosed the Plaintiff with diabetes, edema, meralgia paresthetica, and muscle spasm and prescribed both a diuretic for the edema and an additional muscle relaxant. *Id*. at 302-303.

This appears to be the end of the direct treatment by Dr. Lesniak, and further care was provided to the Plaintiff in the same medical practice, primarily by CNP Krech. However, on July 7, 2016, Dr. Lesniak co-signed a Disability Impairment Questionnaire regarding the Plaintiff's impairments, restrictions and ability to work. *Id*. at 409.

With regard to Dr. Lesniak's opinion, the ALJ determined that "[Plaintiff] does not believe that she ever discussed her limits with Dr. Lesniak, and only treated with him twice…. It appears as if he may have just signed off on the form completed by Ms. Krech, even though he had not seen the [Plaintiff] in over a year…. Therefore, because this medical opinion is based mainly on the [Plaintiff's] subjective complaints, and is not supported by the objective medical evidence, the undersigned gives it little weight." *Id*. at 61.

It is incumbent on the ALJ to analyze and make a determination pursuant to 20 C.F.R. § 404.1527(a)(2) with regard to Dr. Lesniak's status as a "treating physician."[3] "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 876 (6th Cir. 2007) (alteration in original) (quoting 20 C.F.R. § 404.1502). In this case, the ALJ fails to analyze the actual extent of the treatment provided by Dr. Lesniak, other than to state he had only treated the Plaintiff on two occasions and had not seen her for over a year before he signed the evaluation. The ALJ failed to perform an adequate regulatory examination of Dr. Lesniak's treating status including discussion of relevant factors such as the extent of Dr. Lesniak's examination and treatment before and after the Plaintiff's emergent back care, his detailed diagnosis, prescriptions provided, or the

---

[3] 20 C.F.R. § 404.1527(a)(2) describes a physician's status as a treating source, stating that a "[t]reating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source."

longitudinal continuing care within his own practice group with CNP Krech. Further, the ALJ concludes, without support beyond mere speculation, that it appears Dr. Lesniak may have just "signed off" on the Disability Impairment Questionnaire. There is no evidence of record to support this conjecture by the ALJ and his cursory dismissal of the necessary analysis of Dr. Lesniak's status and opinion. It is recommended that, on remand, the ALJ should provide this analysis.

Further, the ALJ's analysis and rejection CNP Krech's impairment opinion is not supported by substantial evidence and is contrary to the evidence of record. While the ALJ correctly determined that, under the pertinent regulatory scheme, CNP Krech is not a treating source, the ALJ fails to adequately discuss the relevance and weight attributable to CNP Krech as an "other source." The Sixth Circuit has discussed the analysis of this type of testimony:

> As a nurse practitioner, [the CNP] is listed under "other [non-medical] sources." … We have previously held that an ALJ has discretion to determine the proper weight to accord opinions from "other sources" such as nurse practitioners. … However, at oral argument, Cruse suggested that a recent Social Security Ruling controls our analysis. SSR 06–03P was issued effective August 9, 2006, and clarifies how the Commissioner is to consider opinions and other evidence from sources who are not "acceptable medical sources." … While the ruling notes that information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." … The ruling goes on to note that:
>
>> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners ... have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists. Opinions from these medical sources who are not technically deemed "acceptable medical sources," under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file.
>
> Further, the ruling explains that opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how

8

consistent the opinion is with other evidence, and how well the source explains the opinion. … Finally, the ruling states that:

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions for these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (internal citations omitted).

The ALJ provides two sentences in explanation of his rejection of CNP Krech's opinion. The first is that "the objective medical evidence of record and the [Plaintiff's] relatively normal activities of daily living do not support the extreme limitations found in this assessment[.]" (Doc. #7, *PageId* #61). The second is that "the [Plaintiff] testified at the hearing that she believes Ms. Krech called her at home and asked her the questions on the form and then recorded the [Plaintiff's] answers[.]" *Id*.

Based on his failure to discuss the relevant "objective medical evidence of record[,]" it is unclear whether the ALJ actually considered the relevant factors in evaluating CNP Krech's opinion under the regulations. His unclarified page citation to a portion of the Plaintiff's psychological assessment by Dr. Groneck, a page of her physical therapy discharge form, a physical examination by Dr. Mulinowski, and a primary care report of CNP Cunningham, do not demonstrate that substantial evidence supports the ALJ's conclusions. In fact, as pointed to by Plaintiff's counsel, much of the information contained in the indicated exhibits demonstrate ongoing positive tests and limitations which would support CNP Krech's disability impairment opinion. (Doc. #8, *PageID* #s 709-11). While the ALJ may certainly explain his assertions, he "has

9

a duty to meaningfully articulate the reasons she has credited or rejected particular sources of evidence with sufficient specificity as to allow the reader to follow her reasoning." *Barrett v. Comm'r of Soc. Sec.*, No. 3:16-CV-00119, 2017 WL 2790666, at *5 (S.D. Ohio June 28, 2017) (Newman, M.J.), *report and recommendation adopted*, No. 3:16-CV-119, 2017 WL 3027084 (S.D. Ohio July 14, 2017) (Rice, D.J.) (internal citation omitted).

The ALJ again errs in attempting to refute CNP Krech's opinion by referencing the Plaintiff's "relatively normal activities of daily living," without elucidating how this conclusion is supported by the medical records during the relevant period of her treatment and with findings regarding the Plaintiff's testimony about her alleged significant limitations.

The conclusory statements made regarding the Plaintiff's complaints, daily activities, and vague references to the record are insufficient to show that substantial evidence supports his conclusions and rejection of CNP Krech's opinion. Substantial evidence is more than a "mere scintilla" of evidence, but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Finally, the ALJ's statement that the Plaintiff testified that "she believes Ms. Krech called her at home and asked her the questions on the form and then recorded the [Plaintiff's] answers" is a mischaracterization of the actual testimony. In pertinent part, the Plaintiff testified that:

> Q: Now, let's see here. On 7/7/16 Joyce Critch [sic] signed a document, also Michael Larniak [phonetic]
>
> A: Lesniak [phonetic].
>
> …
>
> Q: … And on a functional … well, it's … let me see, disability impairment questionnaire. Did they actually ask you the questions, or did a secretary ask you the questions, or did … like, sometimes the nurse might ask …

10

A:      It was…

Q:      … and sometimes they do it over the phone, sometimes they do it personally. Can you tell me, did the … first of all, let me ask you this.

A:      All right.

Q:      Did a nurse … or did a secretary call you over the phone and ask you the questions?

A:      I'm thinking that Joyce called me and asked me the questions.

Q:      Okay. Now, are you saying…you're thinking, you're not….

A:      Right. Two years ago…

…

Q:      Now, … on that one you say you think you remember Joyce calling you on the phone, or did she…

A:      I believe she called me on the phone.

Q:      Okay. So…and then…let me ask you some of the questions,…

A:      Okay. That's fine.

Q:      …you can tell me if you remember this so…

A:      Okay.

Q:      And you're saying Joyce actually called you, though, …

A:      Correct.

Q:      …you think? Okay. Do you remember her calling you?

A:      She called several times, so I'm not sure. I assume one of those would have been that.

Q:      Okay. Well, maybe the…let me ask the specific questions,…

A:      Okay.

11

Q: …you tell me if you remember the question and if you remember the answers you gave. Okay? Your ability to stay in a seated position for the following number of hours, so she might have asked how long can you stay seated at one time. And she has circled less than an hour at a time. That's the lowest category on the form. Do you[] remember the question, and then do you remember giving her the answer saying less than an hour?

A: I don't remember that one specifically, but if anyone asked that would be five, 10 minutes is,…

Q: Okay.

A: …you know, definitely my range…

Q: But you don't remember the question and the answer, right?

A: No.

Q: Okay. Your ability to stand and/or walk…oh, no, you know what, that first one was this, your ability to sit at a workplace in an eight-hour day total, that was…

A: Oh, yeah.

Q: …not at one time. So, and that was less than one hour total for the…

A: Right. That would make sense.

Q: Now, did…now, I realize that you may be able to say, yeah, this is what I was able to do, or what I am able…

A: Right.

Q: …to do. That's not what we're asking.

A: Okay.

Q: Do you remember her asking you the question and then giving her the answer less than an hour for a total eight-hour day? If you don't…

A: No.

Q: …remember, that's okay.

A: No, I was going to say…

12

Q: Okay. Yeah, okay. So, that one you don't remember.

A: No.

Q: In an eight-hour day, how long can you stand and/or walk total? Now, less than an hour, one hour, two hours, three hours, four hours, up to six hours plus, do you remember him…her asking the question, and then telling her less than an hour total?

A: I don't remember.

Q: Okay. Did she ask you "is it necessary to elevate your legs while sitting" and did you answer "yes"…well, one of the categories is "yes, both legs," and that's what she checked off.

A: Yes.

Q: Do you remember the question…

A: I do remember that one.

…

A: Yeah, she told me it's the only way to get rid of swelling is to elevate the legs. I do remember that.

Q: But…and she asked you the question…

A: Yeah, in the conversation, yes…

Q: …right?

A: … I do remember that one.

Q: Do you remember her asking you…oh, "how frequently do you need to get up from a seated position to move around, every 45 minutes to an hour. Do you remember the question…

A: I don't remember that one, but…

Q: Okay.

A: …it sounds right, but I don't remember the question.

Q: Now, again, you know, if you don't remember, that's fine,…

13

A: Right. Yeah.

Q: …just say you don't remember. "How long before your patient can return to"…no, that's…okay. So, she didn't fill out any of the lift and carries there. It says, "Will you needed unscheduled breaks during the eight hour day?" And do you remember the question, and remember answering yes?

A: Yes, I believe I remember that question.

Q: Okay. And then, the next part of that question is, "If yes, how often will this happen," "every hour"…

A: Every hour.

Q: You remember telling her that?

A: Yes.

Q: Okay. And then, "on average how long will you need to rest before returning to work," "10 minutes"?

A: Yeah, I was just going to say…

Q: Oh, you remember the question…

A: …10 minutes, I remember that, correct.

Q: Okay. You remember the question and the answer?

A: Yes.

Q: Okay.

A: Correct.

Q: Okay. And on average how often would you be absent from work, and the categories are more often than three times a month, once a month, less than once a month, two to three times a month. Do you remember the question and then telling her more than three times a month?

A: No, I don't remember that one.

Q: Yeah, okay. That's okay. When did you start seeing her, can you tell me the year?

A: 2014, 2015, right in there.

14

> Q: Okay.
>
> A: I think I only saw her a couple of times before everything happened.
>
> Q: Now, when she went over the form with you, was that…I'm sorry, over the phone, or was that in the office?
>
> A: I believe it was over the phone.
>
> Q: Okay. And was Dr. Lesniak there on the phone call?
>
> A: No.
>
> Q: Okay. How often did you see Dr. Lesniak?
>
> A: Twice, I believe. Joyce wasn't in when it happened, so I saw him first.
>
> Q: Okay. So, you've seen him from around that time to today about two times, right?
>
> A: Correct.

(Doc. #7, *PageID* #s 84-90).

While Plaintiff did testify that she recalled speaking with CNP Krech about her disability impairment, she repeatedly responded to the ALJ's questions that she was unsure about whether she was asked or responded to a majority of the referenced questions. Further, despite the CNP's discussion on any of these issues with the CNP, it is a non-sequitur that the CNP therefore merely recorded Plaintiff's statements as the CNP's opinion regarding her disability impairment. Substantial evidence does not support the ALJ's assertion that the CNP merely "asked the [Plaintiff] the questions on the form and then recorded the [Plaintiff's] answers."

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[4]

**B.      Remand**

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations

and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Disability Insurance Benefits should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Susan Rae Blamer was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.

August 13, 2021						*s/Peter B. Silvain, Jr.*
							Peter B. Silvain, Jr.
							United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).